## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 26 2015, 10:02 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| **ATTORNEY FOR APPELLANT** | **ATTORNEY FOR APPELLEE RICK L. BARNES** |
| Eric D. Orr | |
| Berne, Indiana | Marylyn K. L. Ernsberger |
| | Ernsberger & Helmer, P.C. |
| | Angola, Indiana |
| | |
| | **ATTORNEYS FOR APPELLEE STATE OF INDIANA** |
| | |
| | Gregory F. Zoeller |
| | Attorney General of Indiana |
| | |
| | Frances Barrow |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Beth Marquardt, | February 26, 2015 |
| *Appellant,* | Court of Appeals Case No. 90A02-1406-JP-410 |
| v. | Appeal from the Wells Circuit Court |
| Rick L. Barnes, | The Honorable Kenton W. Kiracofe, Judge |
| and | |
| State of Indiana, | Cause No. 90C01-1309-JP-25 |
| *Appellees.* | |

**Brown, Judge.**

Beth Marquardt ("Mother") appeals the trial court's order modifying child support. Mother raises three issues, which we revise and restate as whether the trial court abused its discretion or erred in determining the weekly child support obligation of Rick L. Barnes ("Father"). We affirm in part, reverse in part, and remand.

### Facts and Procedural History

Mother and Father are the parents of M.B., who was born in August 2012. Mother and Father lived together for approximately six months after M.B. was born. On September 6, 2013, the Wells County Child Support Office (the "State") filed a petition to establish paternity for M.B., and in November 2013 a stipulation of paternity was filed. The State filed a motion for collateral hearing on December 5, 2013, and the court held a hearing on May 2, 2014.[1] Father testified regarding his income, the cost of health insurance, that he paid seventy-five dollars per week to Mother in support since the day he and Mother no longer lived together, and that he had a legal duty for two other children.

---

[1] We note that the September 6, 2013 petition and the December 5, 2013 motion are not included in the appellant's appendix. *See* Ind. Appellate Rule 50(A)(2)(f) (providing that the appellant's appendix shall contain "pleadings and other documents . . . that are necessary for resolution of the issues raised on appeal").

Mother testified regarding, among other things, her tanning salon business, her rental property, her living arrangement, and her child care situation.

[3] In an order file-stamped May 13, 2014, the court ordered that the parties have joint legal custody of M.B. and that Mother have physical custody of M.B. The court further ordered that Father "shall have 1 overnight every other weekend" and that "Mother shall always have the child every Christmas day with Father having every Christmas Eve unless otherwise agreed upon." Appellant's Appendix at 5. The court ordered that, pursuant to an attached child support worksheet, Father was to pay support for M.B. in the amount of seventy-four dollars per week from February 22, 2013 until May 1, 2014, and that, pursuant to a second attached worksheet, Father's support order of seventy-four dollars per week was to be modified to forty-four dollars per week commencing May 2, 2014. The second child support obligation worksheet attached to the court's order specified in part that Mother's weekly gross income was $602.25, that Father was given credit for parenting time for ninety-eight overnight visits, and that Father's weekly support obligation was $44.34. Mother now appeals.[2]

---

[2] The State of Indiana appeared as an appellee and filed a Notice of Joining Co-Appellee's brief indicating that it joined in the appellee's brief filed by Father.

## *Discussion*

[4]     The issue is whether the trial court abused its discretion or erred in determining the weekly child support obligation of Father.  Ind. Code § 31-16-6-1(a) provides:

> In an action for . . . establishment of paternity under IC 31-14, the court may order either parent or both parents to pay any amount reasonable for support of a child, without regard to marital misconduct, after considering all relevant factors, including:
>
> > (1)  the financial resources of the custodial parent;
> >
> > (2)  the standard of living the child would have enjoyed if:
> >
> > > * * * * *
> >
> > > (C)  in the case of a paternity action, the parents had been married and remained married to each other;
> >
> > (3)  the physical or mental condition of the child and the child's educational needs; and
> >
> > (4)  the financial resources and needs of the noncustodial parent.

[5]     Decisions concerning the payment of child support rest within the sound discretion of the trial court.  *Douglas v. Spicer*, 8 N.E.3d 712, 714-715 (Ind. Ct. App. 2014), *reh'g denied*.  On review, we will reverse a trial court's decision in child support matters where we find that there was an abuse of discretion or if the trial court's determination on the issue is contrary to law.  *Id.*

[6]     Mother maintains that the court abused its discretion in determining her weekly gross income for purposes of calculating support and in failing to include a

credit for child care costs, and that the court's order giving Father credit for overnight visits is clearly erroneous.

A. *Mother's Weekly Gross Income*

With respect to Mother's weekly gross income, at the hearing the trial court verbally stated in part:

> With respect to [M]other's income, . . . [t]he dilemma the Court is faced with is this: you have a situation where someone is working a job and I assume she is putting in a lot of time, you know, a lot of blood, sweat and tears into her own business. Trying to be her own boss and run that and I commend her for that but if the business continues to run at a loss, um, one or two things doesn't add up. If it runs at a loss every single year than [sic] you're foolishly throwing money down the drain or there is really some money that is being made and not being represented in tax returns. I think we all know that that's possible to beat. Have a business that operates at a loss and still have some money so [] I think at a minimum I'm going to start with, I think $290.00 is appropriate. I think counselor's argument regarding in-kind income with respect to the housing she receives I think is also appropriate. She doesn't pay anything for housing. There's a lot of testimony today that some of the child care expenses were ran through the business, um, I am going to impute income at the sum of $602.25 to [M]other. Um, I don't see any other way to do this but there has to be, if she's running at a loss, I mean, if she's making minimum wage to drive from Ossian to . . . Fort Wayne, I don't see her doing that for a minimum wage job. Um and she is saying she makes and doesn't have any money and so I guess at a point why are we doing that. Um, so I am imputing that to her. . . .

Transcript at 62-63.

Mother contends that her weekly gross income is less than minimum wage, consisting of net earnings from a rental property and a weekly draw from a

tanning salon, that she resides with her father and pays him when she can, and that under no circumstances will forty-four dollars per week in child support plus Mother's income provide M.B. with the standard of living the child would have enjoyed had her parents been and remained married to each other. Mother further argues that the court's order places her "in a position of dependency, assuming that a situation where Mother pays her father for housing when she can will continue and further assuming that this 'benefit' increases her weekly income to $602.50," that "[n]either under employment or intentionally divesting oneself of income is present here," that she "has been put in a position of potentially sacrificing the ultimate for the immediate by giving up on a business that is recuperating and improving because it has had a couple of tough years," and that, under the court's order, Father "will pay a mere six percent (6%) of his gross salary of the benefit of the child." Appellant's Brief at 6.

Father maintains that the court correctly imputed income to Mother, that Mother has a tanning salon business and a rental house from which she receives income, and that Mother lives with her father and has paid him a total of three hundred dollars for living expenses in the five months prior to the hearing. Father argues that Mother receives income for vehicle expenses through her business which amounted to $1,302.34 to date in 2014 and that the court was well within its discretion to impute income of $602.50 given the testimony.

Child Support Guideline 3A addresses the definition of weekly gross income for purposes of determining child support. Paragraph 1 of Child Support Guideline 3A provides in part:

> *Definition of Weekly Gross Income (Line 1 of Worksheet).* For purposes of these Guidelines, "weekly gross income" is defined as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon "in-kind" benefits. Weekly gross income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, workmen's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, inheritance, prizes, and alimony or maintenance received from other marriages. . . .

Paragraph 2 of Child Support Guideline 3A provides:

> *Self-Employment, Business Expenses, In-Kind Payments and Related Issues.* Weekly Gross Income from self-employment, operation of a business, rent, and royalties is defined as gross receipts minus ordinary and necessary expenses. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed to restrict the deductions to reasonable out-of-pocket expenditures necessary to produce income. These expenditures may include a reasonable yearly deduction for necessary capital expenditures. Weekly Gross Income from self-employment may differ from a determination of business income for tax purposes.
>
> Expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses. Such payments might include a company car, free housing, or reimbursed meals.

The self-employed shall be permitted to deduct that portion of their FICA tax payment that exceeds the FICA tax that would be paid by an employee earning the same Weekly Gross Income.

[12] In addition, Paragraph 3 of Child Support Guideline 3A provides:

*Unemployed, Underemployed and Potential Income*. If a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community. If there is no work history and no higher education or vocational training, the facts of the case may indicate that Weekly Gross Income be set at least at the federal minimum wage level.

[13] Paragraph 2 of the Commentary to Child Support Guideline 3A provides in part:

a. *Self-Employment, Rent and Royalty Income*. Calculating Weekly Gross Income for the self-employed or for those who receive rent and royalty income presents unique problems, and calls for careful review of expenses. The principle involved is that actual expenses are deducted, and benefits that reduce living expenses (i.e. company cars, free lodging, reimbursed meals, etc.) should be included in whole or in part. It is intended that actual out-of-pocket expenditures for the self-employed, to the extent that they are reasonable and necessary for the production of income, be deducted. Reasonable deductions for capital expenditures may be included. While income tax returns may be helpful in arriving at Weekly Gross Income for a self-employed person, the deductions allowed by the Guidelines may differ significantly from those allowed for tax purposes.

The self-employed pay FICA tax at twice the rate that is paid by employees. At present rates, the self-employed pay fifteen and thirty one-hundredths percent (15.30%) of their gross income to a designated

maximum, while employees pay seven and sixty-five one-hundredths percent (7.65%) to the same maximum. The self-employed are therefore permitted to deduct one-half of their FICA payment when calculating Weekly Gross Income.

* * * * *

d. *Imputing Income.* Whether or not income should be imputed to a parent whose living expenses have been substantially reduced due to financial resources other than the parent's own earning capabilities is also a fact-sensitive situation requiring careful consideration of the evidence in each case. It may be inappropriate to include as gross income occasional gifts received. However, regular and continuing payments made by a family member, subsequent spouse, roommate or live-in friend that reduce the parent's costs for rent, utilities, or groceries, may be the basis for imputing income. The marriage of a parent to a spouse with sufficient affluence to obviate the necessity for the parent to work may give rise to a situation where either potential income or imputed income or both should be considered in arriving at gross income.

[14]    The evidence shows Mother owns a tanning salon business and receives income from a rental property, and her completed tax returns for 2012 and 2013 were admitted into evidence. Mother's 2013 tax return shows an adjusted gross income for 2013 of "-16,385." Petitioner's Exhibit B. With respect to her rental property, the 2013 return shows rents received of $8,075 and total expenses of $5,713, of which $1,927 was attributable to depreciation, for a total rental income of $2,362. Her 2013 tax return also shows, with respect to her business, gross income of $23,026 and total expenses of $33,263, for a loss of $10,237. The tax return shows the business's expenses included $758 in advertising expenses, $903 for car and truck expenses, $3,474 in depreciation, $677 for insurance, $3,968 for mortgage expenses, $2,500 for legal and professional

services, $306 for office expenses, $3,766 for the lease of vehicle, machinery, and equipment, $2,188 for the lease of other business property, $214 for repairs and maintenance, $949 for supplies, $736 for taxes and licenses, $5,376 for utilities, and $7,448 in other expenses. The 2013 tax return also shows a net operating loss carryforward of $8,965, taxable interest of thirteen dollars, dividends of two dollars, and IRA distributions of $440.

[15] Mother's 2012 tax return shows an adjusted gross income of "-8,758." State's Exhibit 3. With respect to her rental property, the return shows rents received of $7,800 and total expenses of $5,322, of which $1,927 was attributable to depreciation, for a total rental income of $2,478. With respect to her business, the return shows gross income of $51,590 and total expenses of $52,499, for a loss of $909. The tax return shows the business's expenses included $2,889 for advertising, $4,715 for car and truck expenses, $4,911 in depreciation, $2,353 for insurance, $4,957 for mortgage expenses, $380 for legal and professional services, $274 for office expenses, $3,561 for the lease of vehicle, machinery, and equipment, $4,368 for the lease of other business property, $2,146 for repairs and maintenance, $603 for supplies, $2,368 for taxes and licenses, twenty-nine dollars for deductible meals and entertainment, $6,440 for utilities, $7,774 for wages, and $4,731 in other expenses. The 2012 tax return also shows a net operating loss carryforward of $10,534, taxable interest of $199, and dividends of eight dollars.

[16] With respect to Mother's tanning salon business, when asked if she paid some of her bills out of her business, Mother answered "[n]o," and when asked "you

never put any meals or gas or anything on that," she testified "I do but my accountant, I give him the actual rental, or the bus mileage that I do and he adjusts it at the end of the year . . . ." Transcript at 21. When asked if it was fair to say that Mother, instead of taking a draw or income, might pay for other personal expenses, Mother answered "[n]o, he fixes it at the end of the year so I always put that down as a draw." *Id.*

[17] Mother further testified that she moved the location of her business in 2010 to its current location in Fort Wayne. She stated that she made the greatest amount of money in 2010, and when asked what happened after that, she stated that the business "moved to the new location so it's recuperating expenses," that she bought new equipment, and that the move caused the business's rent to increase. *Id.* at 26. She referenced a summary sheet which shows hours worked of 2,403.89 in 2011, 1,286.6 in 2012, 1,221.8 in 2013, and, as of when the summary was prepared, 632.81 in 2014. When asked why it appeared that 2012 and 2013 were "substantially less than the prior years," Mother testified that "2012 was when [M.B.] was born so [she] was on maternity leave" and that "2013, [she] didn't go back to work until the end of March." *Id.* at 37. Mother also testified: "We've [had] losses since 2010 when I moved to the new location and we bought new equipment and the rent has gone up. We are recuperating from that. This year is better. Last year, we had a disgruntle[d] employee." *Id.*

[18] With respect to rental property income, Mother testified that she had rental income from a house, that she charged $650 per month, that she had charged

that amount in 2013 and had been charging that amount through 2014, that she paid a monthly mortgage payment of $360, along with taxes and insurance for the rental property. Mother's tax returns show that she had total income related to the rental property of $2,478 in 2012 and $2,362 in 2013.

[19] With respect to her residence, Mother testified that she lived with her father, and when asked if she paid him anything, she replied "I pay him when I can." *Id.* at 20. She testified "[t]his year I had paid him [] $300" and that "[t]anning salons are busy 6 months of the year and the rest of the time they are not so in my slow time, no I will not be able to pay him rent." *Id.* at 21. She also indicated she did not pay for utilities.

[20] With respect to transportation, Mother indicated that she traveled between twenty-nine and thirty miles from her residence to the salon. She referenced the summary sheet which she testified contains a summary of her draws and contributions, rental income, and her "portion of vehicle expenses," *id.* at 27, and the summary shows an amount of $1,302.34 for 2014 under the heading "car."[3] Petitioner's Exhibit C.

---

[3] The summary also shows car expenses of zero dollars in 2013 and $3,653.22 in 2012.

Trial courts make case-by-case determinations regarding weekly gross income from self-employment and imputing income for the purpose of computing child support based upon specific circumstances as they exist or are presented to the court. We note that weekly gross income from self-employment for child support purposes may differ from a determination of business income for tax purposes, that the principle involved is that benefits that reduce living expenses should be included in whole or in part in a parent's gross income, that support may be calculated based on a determination of potential income if a court finds a parent is voluntarily underemployed without just cause, and that, even in the absence of evidence of probable earning or earnings levels in a community, the facts may indicate that a parent's weekly gross income be set at least at the federal minimum wage level. See Support Guideline 3A, Paragraphs 2-3. Therefore, it was not improper for the trial court to find that Mother's weekly gross income attributable to her business, given the business's gross income and various expense amounts and the hours devoted to the business as discussed above, was at least the federal minimum weekly wage of $290. In addition, it was not improper for the court to include in Mother's weekly gross income an amount attributable to the fact that she was living with her father and paid little or no money toward rent or housing and utilities. See Paragraph 2 of the Commentary to Guideline 3A (noting that "regular and continuing payments made by a family member . . . that reduce the parent's costs for rent, utilities, or groceries, may be the basis for imputing income"). Mother has virtually no living expenses, and yet she earns rental income of her own. Mother stated that she made the greatest amount of money in 2010 but moved the location of the

salon that year to a new area between twenty-nine and thirty miles from her residence, causing the business's rent to increase, and she purchased new equipment. Although it is Mother's prerogative to make changes to her business, the testimony and documentary evidence before the trial court support a conclusion that Mother is either under-employed or under-reporting her income, and we are not in a position to make credibility determinations.

[22] Based upon the record and the Support Guidelines and commentary set forth above, and keeping in mind that we place a strong emphasis on trial court discretion in determining child support obligations, we cannot say that the trial court abused its discretion in establishing Mother's weekly gross income for the purpose of determining Father's child support obligation.

B. *Child Care*

[23] Mother further asserts that the trial court abused its discretion in failing to include a credit for estimated child care costs. The court found:

> With respect to child care expenses, um, currently there isn't one. That may change and that may change the support obligation but currently there isn't a child care expense. The testimony that I heard previously was that mother did, again paid some of this through the business. Um, some of the daycare or child care was provided in the business when the child was there at her business and was paid just as and she just paid her hourly employees to watch the child. I am not going to, and there was a period of time when the parties lived together, so I am not going to in the calculation include child care at this time. Again, that may change. When there is evidence presented that the child care expense exists again it comes back to the situation for her to pay $120.00 per week or even $135.00 per week for child expenses when she makes minimum wage income, um, to pay half

your income in child care expenses for a minimum wage job doesn't make a lot of financial sense so I'm not going to award child support at this time.

Transcript at 63-64.

[24] Mother argues that failing to provide for child care expenses "will harm the child's financial position in that as a result of the order, Mother must continue and require her employees to provide daycare services and watch her business decrease because this diverts the attention of the staff away from the business" and asks "[m]ust a custodial parent in need of daycare for his or her child find a daycare provider who will provide the services for free until such time as the other parent is ordered to pay his or her pro-rata share for the expenses associated with said care?" Appellant's Brief at 7. Father points to the comment to Support Guideline 3(E)(1) which states that, when potential income is attributed to a party, the court should not also attribute work-related child care expenses which are not actually incurred. Father notes that Mother testified that M.B. was at Mother's business and, when Mother did pay for child care, she was paying one of her employees out of her business and not out of her pocket.

[25] Paragraph 1 of Child Support Guideline 3E provides in part:

> Child care costs incurred due to employment or job search of both parent(s) should be added to the basic obligation. It includes the separate cost of a sitter, day care, or like care of a child or children while the parent works or actively seeks employment. Such child care costs must be reasonable and should not exceed the level required to

provide quality care for the children.  Continuity of child care should be considered. . . .

The parent who contracts for the child care shall be responsible for the payment to the provider of the child care. . . .

When potential income is attributed to a party, the court should not also attribute work-related child care expense which is not actually incurred.

Paragraph 1 of the Commentary to Support Guideline 3E provides in part: "When potential income is attributed to a party, the court should not also attribute a work-related child care expense which is not actually incurred because this expense is highly speculative and difficult to adequately verify."

[26]     At the hearing, a letter was admitted which stated that Mother had been paying for child care as of September 13, 2013.[4]  However, Mother testified that the amount had changed in 2014, and when asked what she was paying in 2014, Mother testified "[c]urrently I do not have a babysitter" and "I've looked at 4 or 5 different childcare providers and the cost will range anywhere from $143 to $157 . . . ."  Transcript at 17.  When Mother was later asked if she had child care from January through the hearing, Mother testified "[j]ust my employees.

---

[4] The letter stated that Mother paid "$100 every other week, and $120 every other week" and that, "[s]tarting in December of 2013," the amount would change to $135 per week.  State's Exhibit 2.

I stay." *Id.* at 34. She indicated that she paid her employees an hourly rate of $7.50, that she had "three different employees but it's only one there each," and, when asked "how is this working," that it was "[n]ot very good." *Id.* Mother stated that she could not "get anything done during the day when [M.B.] is there with [her]," that "[i]t is hard to sell people packages, tanning lotion, it's hard to clean a bed," that "[i]t's just impossible to get my work done," and that "[i]t affects sales." *Id.* at 35. As noted above, a summary sheet shows hours worked of 1,221.8 in 2013 and, as of when the summary was prepared, 632.81 hours in 2014.

[27] Under the circumstances, including that Mother did not directly or personally incur any child care expense and the fact that the evidence related to the cost to Mother's business of having M.B. with Mother at work during the hours she worked is inexact, we cannot say the court abused its discretion in declining to provide a credit for child care expenses at this time. Mother may seek a modification of support under Ind. Code § 31-16-8-1 in the future as appropriate.

C. *Credit for Parenting Time*

[28] Mother also argues that the court's order giving Father credit for ninety-eight overnights was clearly erroneous. The court's order provided in part:

> Father shall exercise parenting time, which shall be at all reasonable and proper times as agreed upon by the parties, but not less than as provided by the Indiana Parenting Time Guidelines. Father shall have 1 overnight every other weekend. Mother shall always have the child

every Christmas day with Father having every Christmas Eve unless otherwise agreed upon[.]

Appellant's Appendix at 5. The child support obligation worksheet attached to the court's order shows that Father was to be given a credit for parenting time for ninety-eight overnight visits.

[29] Mother argues that the court "gave Father credit for time it has not yet permitted." Appellant's Brief at 8. She argues that, "[w]hile child support can be revisited in the future, the current order provides that Father shall have one overnight every other weekend, which figures to 26 overnights per year, far less than the 98 the Court put in its order." *Id.* Father maintains that the court "clearly stated that one overnight every other weekend was a minimum" and that the court awarded him "ninety-eight (98) overnights which is in its discretion to do so." Appellee's Brief at 7-8.

[30] At the hearing, the court stated:

> Um, in rereading the guidelines with respect to a child of this age, um, again I will note, [Father] did live, they did live together apparently in his home from birth through 6 months, um, and the child is not yet 3 years old. Um, I understand that it can be difficult, ah, and you are putting a lot of trust in the other parent, um, when the child is not in your care, um, the guidelines state for a child 19 months to 36 months, alternating weekends on Saturdays for 10 hours and on Sundays for 10 hours. Then it goes on to say, it talks about being returned prior to bedtime unless overnight is appropriate. So that is the question for the Court. Is overnight appropriate? It, you know, we have a father here who wants to be a part of the child's life, um, I understand the concern about the safety but at some point, [Father] is the father and he's going to have overnights with the child. Um, I haven't heard anything to the Court that demonstrates he is a danger, that he doesn't have any

experience with the child. . . . He has two other children, one of them who has some CPR training and things like that so I think that there is reasonable supervision of the child at his home and so I don't see any reason why he wouldn't have overnight visitation with the child. I understand the child currently is still breastfeeding; however, [Mother's] testimony is that she is trying to wean her off of that, um, and *every other weekend for one night, one overnight over the weekend is not, I think, would fit within that schedule* so I don't see any reason why [Father] should not have overnight visitation with the child *so I am going to order parenting time at all reasonable and proper times and again these are the guidelines that are supposed to be at a minimum, not at the bar at which we should start. These are minimum so I encourage the parties if it is appropriate to have additional parenting time but this is what the Court will follow: all reasonable and proper times and at the minimum the Indiana Parenting Time Guidelines*. The Court will also adopt the Indiana Parenting Time Guidelines holiday schedule with the exception that mother will always have parenting on Christmas and [F]ather would always have parenting time on Christmas Eve, unless otherwise agreed.

* * * * *

With respect then to credit for parenting time, um, [F]ather, I've given the opportunity to have child care, or overnight visitation, I'm going to give the standard 98 overnights per year. However, I will say and the Court will take the overnight visitation away if it is not being exercised and I don't hesitate to do that, that is there for his benefit. I am going to leave it in there for right now to encourage him to have overnight visitation but certainly if it is not being exercised, I won't award it to him in the future.

Transcript at 61-62, 64 (emphases added).

[31] Section II of the Parenting Time Guidelines provides specific parenting time provisions related to overnight parenting and age categories, and subsection C.3.(C) of Section II includes guidelines for parenting time for a child of "Age 19 Months through 36 Months" which provide:

(1) Alternate weekends on Saturdays for ten (10) hours and on Sundays for ten (10) hours. The child is to be returned at least one hour before bedtime, unless overnight is appropriate.

(2) One (1) "day" preferably in mid-week for three (3) hours, the child to be returned at least one (1) hour before evening bedtime, unless overnight during the week is appropriate.

(3) All scheduled holidays for ten (10) hours. The child is to be returned one hour before bedtime.

(4) If the non-custodial parent who did not initially have regular care responsibilities has exercised the scheduled parenting time under these guidelines for at least nine (9) continuous months, regular parenting time as indicated in section II.D.1. below may take place.

[32] Subsection D.1. of Section II includes guidelines for regular parenting time of a child three years of age and older and provides:

(a) On alternating weekends from Friday at 6:00 P.M. until Sunday at 6:00 P.M. (the times may change to fit the parents' schedules);

(b) One (1) evening per week, preferably in mid-week, for a period of up to four hours but the child shall be returned no later than 9:00 p.m; and,

(c) On all scheduled holidays.

[33] The court's written order provides that Father "shall exercise parenting time, which shall be at all reasonable and proper times as agreed upon by the parties, but not less than as provided by the Indiana Parenting Time Guidelines" and that "Father shall have 1 overnight every other weekend." Appellant's Appendix at 5. The court verbally stated that it had given Father "the opportunity to have . . . overnight visitation" and "I'm going to give the standard 98 overnights per year." Transcript at 64.

[34] We note that, according to Section II.C.3.(C) of the Parenting Time Guidelines set forth above, ninety-eight overnight visits per year is not standard for a child younger than thirty-six months of age. At the time of the hearing, M.B. was twenty months old. Moreover, the court's written order specifically provided that Father "shall have 1 overnight every other weekend," Appellant's Appendix at 5, which would comprise approximately twenty-six annual overnight visits. The court also ordered that parenting time shall not be less than as provided by the Parenting Time Guidelines, but, with respect to overnight visits, parenting time of one overnight every other weekend is more, not less, than the parenting time guideline for children younger than thirty-six months old.[5] While the court verbally encouraged "the parties if it is appropriate to have additional parenting time," the court also expressly stated "but this is what the Court will follow: all reasonable and proper times and at the minimum the Indiana Parenting Time Guidelines." Transcript at 64. In light of the court's order that Father shall have one overnight visit every other weekend and that parenting time shall not be less than as provided by the Parenting Time Guidelines, and considering that Mother is not required to permit M.B. to have overnight visits with Father in addition to one overnight

---

[5] The court did not indicate that subsection (4) of Section II.C.3.(C) of the Parenting Time Guidelines was applicable.

visit every other weekend, the court's support order reflecting a parenting time credit for Father for ninety-eight overnight visits is clearly erroneous, and we reverse and remand and order the trial court to recalculate Father's credit for his overnight parenting time until the child is three years of age.

## *Conclusion*

[35] For the foregoing reasons, we reverse and remand for a reduction of the credit assigned to Father for overnight parenting time until the child is three years of age, and for the entry of a revised order and child support obligation worksheet reflecting this adjustment. We otherwise affirm the trial court's order.

[36] Affirmed in part, reversed in part, and remanded.

Bailey, J., and Robb, J., concur.